**UNITED STATES of America ex rel. Carmen GASPERO**

v.

**COMMONWEALTH OF PENN-SYLVANIA.**

**Misc. No. 3308.**

United States District Court
E. D. Pennsylvania.

Sept. 14, 1966.

---

Neil Leibman, Philadelphia, Pa., for relator.

Arlen Specter, Dist. Atty., Michael J. Rotko, Asst. Dist. Atty., for respondent.

## MEMORANDUM AND ORDER SUR PETITION FOR WRIT OF HABEAS CORPUS

VAN DUSEN, District Judge.

Relator, Carmen Gaspero, was charged in Indictment No. 2229, May Sessions 1961,[1] in the Court of Quarter Sessions, Philadelphia County, with fraudulent conversion. On February 3, 1964, after a trial to the court without a jury, relator was found guilty. Post-trial motions were denied by the court with an opinion dated December 2, 1964, and on January 28, 1965, relator was sentenced to a term of from one to five years. On appeal, the Superior Court being equally divided, the judgment was affirmed. Commonwealth v. Gaspero, 206 Pa.Super. 725, 213 A.2d 88 (1965).[2]

In this Petition for Writ of Habeas Corpus, the relator alleges (1) that "The conviction was so devoid of evidentiary support so as to violate the due process clause of the 14th Amendment," and (2) "The Commonwealth failed to prove the commission of a crime of any kind. Further, the Commonwealth failed to prove that defendant was in any way responsible for any loss suffered by private prosecutor." (Document 1, paragraphs 11(a) and 12.)

In United States ex rel. DeMoss v. Commonwealth of Pennsylvania, 316 F. 2d 841, 842–843 (3rd Cir. 1963), the court stated:

"The sole question before us is whether this appeal is within the rule of Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) and Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961). The Court held in those opinions that it is a denial of due process for a state to convict someone upon no evidence of guilt. The Court, however, was careful to point out that '[d]ecision of this question turns not on the sufficiency of the evidence, but on whether this conviction rests upon any

1. Relator was also charged in Indictments Nos. 802 and 803, November Sessions 1961. The trial on these Indictments was held at the same time as that on No. 2229. Judge Saylor found Gaspero not guilty on Nos. 802 and 803.

2. An allocatur was denied by the Supreme Court of Pennsylvania on December 13, 1965, at No. 183-A, Misc.Docket 14. Relator then petitioned the Superior Court for reargument, which was refused, per curiam, February 23, 1966. Relator then filed a petition for writ of habeas corpus in this court, Misc. No. 3238, which was denied on March 31, 1966. On May 12. 1966, a Petition for Reconsideration of the order of March 31, 1966, was denied. It was noted in the comment to the order of May 12, 1966, that the Superior Court, since March 10, 1966, was composed of seven judges, Judge Spaulding having been appointed on that date. Relator then filed a "Petition for leave to file a petition for reargument" in the Superior Court. On June 6, 1966, the Superior Court refused reargument. Relator filed the instant petition in this court on June 21, 1966.

evidence at all.' Thompson v. Louisville, supra at 199, 80 S.Ct. at 625. Thus, the pivotal point of our inquiry is whether the conviction of DeMoss [here Gaspero] rests upon 'any evidence' which would support the finding that he committed the crime charged."

Then the court stated:

"Without need of refinement upon the etymology of the word 'any', it is enough that we find some evidence of 'whatever * * * quantity' on all the essential elements of the charge."

The crime of fraudulent conversion in Pennsylvania is set out in 18 P.S. § 4834:

"Whoever, having received or having possession, in any capacity or by any means or manner, of any money or property, of any kind whatsoever, of or belonging to any other person, or which any other person is entitled to receive and have, fraudulently withholds, converts, or applies the same, or any part thereof, or the proceeds or any part of the proceeds, derived from the sale or other disposition thereof, to and for his own use and benefit, or to and for the use and benefit of any other person, is guilty of a felony * * *."

Only one witness testified at the trial. The defendant did not put on any evidence. Arthur Kret testified for the Commonwealth. Kret operated a rag manufacturing business at 4518 Wayne Avenue, Philadelphia, Pa. The business was conducted under the name of the Philadelphia Wiper and Supply Company and was engaged in " * * * manufacturing whitening rags" (R. 2). Gaspero was Kret's bookkeeper and Gaspero " * * * had complete charge of all the books pertaining to the business" (R. 3). Gaspero handled the checkbooks, made out the checks, took care of the receipts, disbursements and the purchase journal (R. 4, 5).

On Good Friday 1961, Kret " * * * went down to the shop to look at the books and do some other miscellaneous records" (R. 73). It was a Union holi-day and the shop was closed. Kret testified:

" * * * I went to the file room. I came across that group of slips. They happened to be in one of the file boxes, or a box supposed to be sent away for filing with old records. I picked up the papers and looked at them and found they were fairly recent. I took them out and started to compare the information on them with the records that were available to me. My interest was aroused, because in going through them they reflected such a large poundage." (R. 73–74)

The slips referred to by Kret were explained as follows:

A. The slips are in three parts.

Q. What are their colors?

A. White, yellow and pink.

Q. What happens to the three slips?

A. The white slip is kept in the office on file. It should be kept on file to indicate the purchase was made. The pink slip was also kept in the office to indicate a purchase was made. The yellow slip was handed to the seller, so that he could turn this in and get paid. If he didn't have a yellow slip, he couldn't get paid. This is the only indication that the seller sold me something, and that I owe him money. These slips are in three parts." (R. 71).

These slips were made out in the relator's handwriting (R. 74). The handwriting indicated names, dates, amounts, check numbers and descriptions of burlap allegedly purchased from one Louis Stern. These slips were admitted into evidence (R. 75).

On the following work day, Kret confronted Gaspero with these slips and asked for an explanation. "He [Gaspero] didn't answer. He physically ran out of the office." (R. 53, 71–72).

Louis Stern sold burlap to Kret. Kret's business could handle at the most about 30,000 pounds of burlap a year (R. 69). The slips that Kret showed to Gaspero and were admittedly made out

in Gaspero's handwriting indicated purchases from Stern totaling 200,000 pounds (R. 70). Each slip showed "the date, the name of Louis Stern, the number of pounds of burlap bought, and the price, the total price and the check number" (R. 69).

After Gaspero fled the shop, Kret had his books audited and found that there was a discrepancy in the books of $11,375.90. This money was supposedly paid to Stern for the purchase of his burlap. At five cents a pound, this would mean that Kret purchased from Stern nearly a quarter of a million pounds of burlap—ten times the quantity consumed in the business.

Both the check stubs and the cash disbursement entries were made in Gaspero's handwriting (R. 13). But Kret himself signed all the checks (R. 3, 53). Cancelled checks were compared with the bank statement by Gaspero and not by Kret (R. 23). As to the whereabouts of the cancelled checks themselves, Kret testified: "The list always disappeared along with the checks" (R. 44).

Louis Stern was a man over 80 years of age and did not testify because of poor health.

As stated by Judge Saylor in his opinion in the Court of Quarter Sessions:

"An examination of the stubs in the check book showed that checks for various amounts were presumably drawn to the order of various payees but the checks themselves were not among the cancelled checks returned by the bank after payment. However, examination of the purchase journal and 'disbursements' showed that under the same check numbers payments were presumably made to Louis Stern aggregating $11,375.90 for purchases referred to. Even where the stubs themselves were removed from the check books the purchase journal under their numbers showed payments to Stern."

A few examples of this will suffice. There were 40 altogether.

(1) Check stub No. 5398, dated January 6, 1960, indicated a check was drawn in favor of Vicks Chemical Company. According to the stub, the check was drawn for $13.50. The check itself, of course, like all the others involved, was missing. In the cash disbursements journal, which indicated purchases, there was indicated a payment to Louis Stern of $199.08. The cash disbursements journal referred to check stub No. 5398 (R. 6–7).

(2) Check stub No. 5434 indicated that a check was made out payable to Transportation Clearance for $5.40. In cash disbursements, beside Check No. 5434 made out to Louis Stern, is the amount of $234.19 (R. 12, 13). As already noted, both the cash disbursement entries and the check stubs were made out by Gaspero. Kret, who was familiar with Gaspero's handwriting, identified his handwriting (R. 13).

Kret did buy burlap from Stern and did owe Stern some money, but " * * * if all the entries listed for burlap from Louis Stern were so, I would have to be doing ten times the normal amount of business I am presently doing" (R. 32).

As to the cancelled checks which disappeared, Kret testified that Gaspero always picked them up from the bank (R. 13). However, Kret said he learned of this from the bank clerk. This testimony was objected to and excluded by the court (R. 13).

■ It is the function of this court to see if there is any evidence on the record to support the conviction. This court does not have to find the relator's guilt determined beyond a reasonable doubt. United States v. Commonwealth of Pennsylvania, supra.

■■ Defendant's flight upon accusation is indicative of a consciousness of guilt. Commonwealth v. Myers, 131 Pa.Super. 258 (1938); Commonwealth v. Fasci, 287 Pa. 1, 134 A. 465 (1926); Commonwealth v. Coyle, 415 Pa. 379, 393, 203 A.2d 782 (1964). The Federal cases are to the same effect. Hunt v. United States, 115 U.S.App.D.C. 1, 316 F.2d 652 (1963); Gicinto v. United States, 212 F. 2d 8 (8th Cir. 1954), where the court

stated: "And evidence of flight is always admissible, especially when the conduct of the defendant is apparently inconsistent with innocence." The theory on which flight is admissible is that it shows consciousness of guilt. Thus, in rebuttal, the defendant may show a reason for his departure, Commonwealth v. Myers, supra. Gaspero did not take the stand to explain why he ran out of the shop when confronted with the slips. "Ordinarily, flight or concealment, standing alone, is insufficient to convict. When accompanied by other evidence, the flight or concealment may justify an inference of guilt." Commonwealth v. Grazziani, 86 Pa.Super. 571 (1925).

In Government of the Virgin Islands v. John Lake, 362 F.2d 770, Opinion filed June 22, 1966, the United States Court of Appeals for the Third Circuit said:

"If, however, the prosecution proves facts from which an inference relevant to the question of the accused's guilt may reasonably be drawn, the burden is necessarily cast upon the accused of going forward with evidence upon the particular point to which the inference relates if he desires to rebut it."

In addition to the relator's flight, there are these items of evidence in the record: he was in charge of the books; the cancelled checks in question always disappeared; all the pertinent entries were made in his handwriting; he had sole excess to these books; Kret could not account for $11,375.90; and no explanation of any kind was ever made by the relator—either at the shop, after the confrontation, or at the trial. Admittedly the figures on the cash disbursement books for the checks involved were in a higher amount than the corresponding check stubs indicated; the delivery slips, made out entirely by Gaspero, were for quantities of burlap which could never have been processed as the firm was not large enough to handle such a quantity; the seller's copy of the delivery slips was still in Gaspero's possession or under his control, whereas when a sale was made it should have been given to the seller;

and there was no explanation by Gaspero as to where the money went if it did not go to him or to serve his purposes. For all these reasons, the court is persuaded that there is the requisite quantum of evidence, and therefore the Petition must be denied.